Kopelson v. Jaiks Perso Corp.

C.P. of Monroe County, no. 5345 Civil 2010.

*David J. Williamson,* for plaintiff.
*Robert J. Kidwell,* for defendants.

SIBUM, *J.*, October 15, 2010—

## I. FINDINGS OF FACT

1. This dispute concerns restrictive covenants contained in the deeds for properties in Shelbrooke Estates, a development located in Stroud Township, Monroe County, Pennsylvania.

2. Sheldon Kopelson is a developer ("developer") of Shelbrooke Estates. Developer owns two properties in Shelbrooke Estates, one of which he maintains as his personal residence. The other property is a residential

building lot.

3. Shelbrooke Estates is located west of Glenbrook Road and also Reish Road as set forth in Plot Book Volume 65, Page 109 of the Monroe County Recorder of Deeds Office.

4. Shelbrooke Estates is a residential subdivision with central sewer and water and contains 45 residential building lots.

5. All roads and utility services within Shelbrooke Estates have been dedicated to local municipalities and municipal entities.

6. The sales price for lots in Shelbrooke Estates has ranged from $45,000.00 to $130,000.00. The combined price for lot and home costs in Shelbrooke Estates has ranged from just under $300,000.00 to more than $500,000.00.

7. On November 12, 1993, Developer recorded a "Declaration of Protective Covenants, Restrictions, Exceptions, Reservations and Conditions" ("original protective covenants"). The original protective covenants were recorded in Deed Book Volume 1919, Page 1243 of the Monroe County Recorder of Deeds Office.

8. Developer recorded an "Amended Declaration of Protective Covenants, Restrictions, Exceptions, Reservations and Conditions" ("amended protective covenants") on July 15, 1998. The amended protective covenants were recorded in Deed Book 2050, Page 7797 of the Monroe County Recorder of Deeds Office.

9. The original protective covenants filed November 12, 1993 applied to all lots in Shelbrooke Estates. The amended protective covenants filed July 15, 1998 applied to all lots conveyed by developer after that date.

10. The amended protective covenants amend the original protective covenants as to paragraph 5 only, and provide as follows:

> 5. No building, structure, including a swimming pool or fence, shall be erected on any lot without first obtaining the approval, in writing, of grantor, as to the location, elevation, construction, plans and design. Grantor, his successors and assigns, shall approve or disapprove, in writing, the said location, elevation, construction, materials, colors, plan and design within fifteen (15) days after the plans and specifications for same have been completely submitted. Exterior construction of any building, structure or any improvement, or backfilling or grading must be completed within one (1) year from the · date that construction operations are commenced. The dwelling must have a total minimum of two thousand four hundred (2,400) square feet of living space, excluding underground levels from such space level requirements. Said disapproval may be based on purely aesthetic grounds.

11. The amended protective covenants modify the original protective covenants as to paragraph 5 only in that the minimum square feet of living space shall be two thousand four hundred (2,400) square feet, excluding underground levels, instead of two thousand two hundred

(2,200) square feet as provided in the original protective covenants.

12. Houses have been constructed on all lots within the Shelbrooke Estates development with the exception of seven lots.

13. All houses that have been constructed within the development have obtained the required written approval for building plans from developer prior to construction.

14. Developer has previously rejected building plans proposing modular homes. Developer has also previously rejected plans proposing a farmhouse style home with vinyl siding.

15. One current owner in Shelbrooke Estates, Anthony Muscarello, changed his building plans with RGB Builders to conform with plans acceptable to developer.

16. All of the homes within Shelbrooke Estates are of stick-built construction, have architectural features which include colors, contours, and lines that are of a similar style, including hip or gable roofs, and have brick, stone or stucco facades.

17. There are no modular or prefabricated homes located in Shelbrooke Estates.

18. Developer has maintained similar architectural styles and stick-built construction in order to ensure conformity in the development and property values.

19. The homes in Shelbrooke Estates have been built by various home builders, including developer's company, Affiliated Builders.

20. In 2005, defendant, David Persaud ("Persaud"), became interested in purchasing a lot in Shelbrooke Estates from developer after his cousin had built a home in the development.

21. Persaud's cousin obtained approval from developer for the cousin's house plans and designs prior to building.

22. Persaud is a real estate closing agent in New York State for Christopher Lim, Esquire, an attorney practicing real estate law in New York. Persaud has been a closing agent for attorney Lim for the past seven years and has been involved in real estate closings with Mr. Lim.

23. On December 29, 2005, Persaud and Mr. Lim signed an agreement of sale to purchase lot 101 of Shelbrooke Estates from developer. The contract purchase price was $130,000.00.

24. At the time Persaud and Mr. Lim signed the agreement of sale, they were given copies of the original and amended protective covenants pertaining to the property.

25. The agreement of sale at paragraph 5(c) specifically references that the conveyance is under and subject to the restrictions of Deed Book Volume 1919, Page 243, and modifications as pertained to a wetland delineation in Deed Book Volume 2126, Page 2437.

26. Persaud received but did not read the original or amended protective covenants. Rather, since he was buying the property with an attorney, he relied on his co-

owner attorney for all legal aspects of the sale.

27. Persaud received the deed from developer at closing and the title policy of American Abstract of Northeast Pennsylvania. Although Persaud received the deed and title policy, he did not review them. Rather, he gave them to his co-owner, Mr. Lim, after which the deed and title policy were placed in Mr. Lim's office safe where Persaud is employed.

28. The deed from developer to Persaud and Mr. Lim for lot 101, Shelbrooke Estates, was recorded in the Monroe County Recorder of Deeds Office in Deed Book Volume 2254, Page 8718.

29. The deed into Persaud and Mr. Lim specifically references that the transfer is under and subject to the original and amended protective covenants.

30. On March 24, 2010, Persaud and Mr. Lim transferred lot 101 to the Jaiks Perso Corporation, a New York registered corporation owned by Persaud, his wife, and a third family member. The deed into the Jaiks Perso Corporation was recorded in Deed Book Volume 2368, Page 7693, of the Monroe County Recorder of Deeds Office.

31. The deed into the Jaiks Perso Corporation specifically states that the premises are "subject to all easements, rights-of-way, protective covenants and mineral reservations of record, if any."

32. The purpose of the transfer was for Persaud to buy out his co-owner Mr. Lim. Persaud took title to the

property in the name of the Jaiks Perso Corporation upon advice of his accountant.

33. Prior to the conveyance from Persaud and Mr. Lim to the Jaiks Perso Corporation, Persaud decided that he would construct a vacation home on lot 101 for use by him and his family. In approximately March or April of 2010, Persaud entered into a construction agreement with Stano Builders, LLC to construct a 2,550 square foot home on Lot 101.

34. At or about the same time, Persaud, through Stano Builders, LLC, ordered a manufactured, modular prefabricated home from Penn Lion Homes to be built on the lot. Persaud obtained zoning and building permits from Stroud Township for the home to be constructed on lot 101 in his individual name as owner on May 27, 2010.

35. Persaud, through Stano Builders, commenced work on the lot for the construction of the home, including site preparation work on or about May 27, 2010.

36. Neither Persaud nor Jaiks Perso Corporation presented building plans or designs to developer prior to starting construction on lot 101 or prior to ordering the modular home from Penn Lion Homes.

37. No one notified developer of the intent to construct on lot 101 prior to starting work.

38. In early June of 2010, developer returned from a trip to Florida and noticed excavation work taking place on lot 101.

39. On or about June 3, 2010, developer met with Mr. contrastano, the owner of Stano Homes, LLC. During the meeting, developer learned from Mr. Contrastano that a home was being constructed on the lot. Mr. Contrastano gave plans for the home to developer for review. At the meeting, developer informed the builder that all plans for homes within Shelbrooke Estates had to be approved by him, and that all homes needed to have a certain style and architectural features in order to receive his approval.

40. Within a few hours of receiving the plans for review, developer called Mr. Contrastano to advise him that the home plans would not be approved because the residence under construction was a modular or prefabricated home.

41. Thereafter, Persaud and developer spoke by telephone, at which time developer confirmed that the home could not be built as designed because it was a modular home and that no other modulars had been approved or built in Shelbrooke Estates. Developer also rejected the plans due to the style and architectural design of the house and the use of vinyl siding.

42. On June 4, 2010, attorney David J. Williamson, counsel for developer, sent a letter to Persaud, together with the original and amended protective covenants, advising that the plans were not approved and that a modular or prefabricated home could not be constructed on lot 101.

43. Persaud acknowledged receipt of attorney Williamson's June 4, 2010 letter and arranged for his New York attorney to respond to the letter by correspondence dated June 9, 2010. Persaud continued construction of the

modular home on lot 101, had caused a foundation to be constructed, and had the modular sections for the home delivered to the site at least one week after the notice of the plan denial was received by Persaud.

44. Persaud paid a deposit of $14,900.00 to Penn Lion Homes at the time he placed his order.

45. The balance of the home purchase price to Penn Lion of $88,000.00 was due and paid by Persaud at the time of delivery of the home to lot 101.

46. The modular home remains on lot 101 in four sections on trailers.

## II. CONCLUSIONS OF LAW

1. Developer has requested equitable relief in the form of a permanent injunction barring construction of the modular home proposed by defendants.

2. The original and amended protective covenants of Shelbrooke Estates are binding on lot owners in Shelbrooke Estates, including lot 101, owned by the defendants Jaiks Perso Corporation and David Persaud.

3. The original and amended protective covenants are unambiguous and have clear construction and meaning.

4. The original and amended protective covenants clearly and unambiguously require that all plans and designs for homes constructed within the Shelbrooke Estates Development are to be reviewed and approved by developer.

5. The original and amended protective covenants run with the land and bind all current and future property owners within the development.

6. Developer has the right to approve or disapprove construction plans and designs, materials, and colors. Developer has the right to approve or disapprove proposed home plans and designs on purely aesthetic grounds.

7. The defendants violated Protective Covenant No. 5 by commencing construction of a residence prior to receiving or requesting approval of the construction plans and design from developer.

8. Developer gave proper notice that no approval was given for defendants' planned construction due to the type of construction, design and materials.

9. The modular home proposed by defendants to be constructed on lot 101 of Shelbrooke Estates is not permitted under the original and amended protective covenants since developer has rejected same.

10. Plaintiff will be irreparably harmed and without a proper remedy at law unless a permanent injunction enjoining defendants' proposed construction is granted.

### III. DISCUSSION

It is a well established principle that restrictive covenants, although not favored by the law, are legally enforceable. *Rader v. Deshler*, 28 Pa. D. & C.4th 40 (1996). Restrictive covenants are to be strictly construed against the grantor and ambiguities shall be resolved in favor of the property owner. *Schulman v. Serrill*, 432 Pa. 206, 211,

246 A.2d 643, 646 (Pa. 1968); *Burns v. Baumgardner*, 449 A.2d 590, 593 (Pa. Super. 1982). In addition, the appellate courts of our Commonwealth have consistently held that restrictive covenants which restrict or apply to the erection or use of buildings or other structures are lawful and enforceable. *McCandless v. Burn*, 104 A.2d 123, 126 (Pa. 1954). Included within restrictive covenants which our courts have held to be enforceable are those which require preapproval of building plans. *Estate of Hoffman v. Gould*, 714 A.2d 1071, 1073 (Pa. Super. 1998); *Harmon v. Burow*, 263 Pa. 180, 106 A. 310 (Pa. 1919). In construing restrictive covenants, the court shall give effect to the intention of the parties as ascertained from consideration of the surrounding circumstances, the parties' situation, the objectives they had in view of the development, and the nature of the subject matter. *Estate of Hoffman*, 714 A.2d at 1073.

In the case now before the court, we find that restrictive covenant 5 states in plain, simple and understandable language that all building plans must be preapproved by developer prior to the commencement of construction. The plans further put all property owners on notice that developer has great leverage and control over the approval or disapproval of building plans and expressly states that plans may be disapproved on purely aesthetic grounds. As such, all property owners are on notice that any and all desired building plans are subject to the subjective discretion of developer.

In reaching this conclusion, we are guided by the Superior Court's decision in the case of *Estate of Hoffman*

*v. Gould,* supra., a case which originated from this court. In the *Estate of Hoffman v. Gould* matter, owners of a lot sought to construct a home on their lot that would have had a vinyl siding exterior. All of the deeds for lots in that subdivision were subject to restrictive covenants requiring submission of plans and specifications to the developer for preapproval. The restrictive covenants did not delineate any criteria or specific conditions necessary for obtaining approval. These restrictive covenants did not specifically prohibit vinyl siding, nor require any specific building or siding materials.

In that case, the developer denied the plans on the basis that the exterior of the home must be sided with wood siding and not vinyl. The owners refused to comply. This court denied the developer's request for an injunction, finding in favor of the owners, in part because the home proposed would look similar to or better than others in the development. On appeal, the Superior Court overruled this court's decision holding that the developers had the absolute right to decide the materials to be used in construction, including exterior siding.

In reaching its decision, the Superior Court noted that although restrictive covenants are to be construed strictly and in favor of the property owner, the Pennsylvania Supreme Court in *Harmon v. Burow,* supra., had previously established that a covenant requiring the preapproval of plans and specifications for a residence by a developer prior to construction is valid and enforceable. *Estate of Hoffman,* 714 A.2d at 1073 (citing *Harmon v. Burow,* 106 A. 310 (Pa. 1919). Based upon *Harmon,* the *Estate of*

*Hoffman* court held that as long as the developer's refusal to approve building plans was not based on a capricious or unreasonable act, in view of the circumstances and evident purpose of the restrictive covenant as determined by the facts of each specific case, the owner is bound by the term of the covenant and the resulting decision of the developer after review of the building plans. *Id.*

In the case at bar, the defendants are in violation of covenant 5 as a result of their failure to submit plans and receive developer's approval for same prior to the commencement of construction. In addition, the decision of developer to deny defendants' building plans in this case after construction had started was not capricious or unreasonable. Developer testified credibly in this matter that he denied the building plans in order to ensure conformity in the character of the neighborhood and to preserve and protect property values. Developer also testified that he had previously denied building plans for modular homes in the past and that there are no modular or prefabricated homes within the Shelbrooke Estates Development.

The testimony of the plaintiff's expert, Thomas McKeown, also indicated that there is a negative stigma in the marketplace with respect to modular homes. Such stigma often results in stick-built homes and properties which neighbor modular homes having lesser resale values than those that are not near modular residences.

The fact that developer has consistently turned down requests for construction modular homes in the development in the past further evidences the reasonable-

ness of developer's actions in denying defendants' request to do so. If defendants' plans had not been denied, those individuals who had been turned down in the past and were required to modify their building plans could come forward with complaints.

The aesthetics of defendants' proposed home also support the reasonableness of developer's decision to reject the defendants' plans. As testified to by the plaintiff and Mr. McKeown, the homes in Shelbrooke Estates have similar and distinctive architectural features, including hip or gable roofs, multiple roof lines, brick, stone or stucco facades and no large front porches. Furthermore, none of the homes within the Shelbrooke Estates Development are of a single, rectangular shape and style like that being proposed by defendants. Pursuant to the protective covenants in effect in this case, developer was within his rights to reject defendants' plans based solely on the rectangular shape and style of the proposed residence.

We also feel compelled to address several of the issues defendants have raised in their defense, none of which we find to have any merit. First, the defendants claim ignorance of the plan review requirement. However, we find that the evidence presented supports a conclusion that the defendants knew or should have known of the covenant requiring plan approval. Persaud acknowledged receiving copies of the restrictive covenants at the time he and Mr. Lim signed the agreement of sale and again at the time of closing. The fact that he chose not to read the covenants cannot now be raised as a shield to protect him

from his own shortcomings. Additionally, defendant's cousin had built a home in Shelbrooke Estates and had received prior plan approval from developer before commencement of construction. Additionally, the deed into Persaud and Mr. Lim for the lot contained notice of the applicability of the restrictive covenant as did the deed from Persaud and Mr. Lim to Persaud and Jaiks Perso Corporation. Further, Persaud, as an individual who earns a living handling real estate closings, either knew of the covenant or should have known better. Regardless, his ignorance of recorded covenants which were referenced in the chain of title is not an excuse as a mere recording is sufficient notice.

Finally, defendants also claim that conformance with the requirements of developer is an economic hardship. The Superior Court in the *Estate of Hoffman* case specifically addressed this issue. In that case, the court required adherence to the requirement of developer to utilize wood siding instead of vinyl, despite the owner's contention that doing so was an economic burden. In addition to refusing to accept an economic hardship excuse for not conforming to a developer's requirement, the Superior Court in the *Estate of Hoffman* matter also refused to be swayed by the owner's argument that its proposed residence was compatible and in some cases more attractive than others in the development. The Superior Court clearly held that building plan approval reserved to the developer by restrictive covenant is entirely enforceable, despite economic hardship or the owner's own aesthetic view. *Estate of Hoffman*, 714 A.2d at 1073.

Based on the Superior Court's holding in the *Estate of Hoffman*, we find that defendants in this matter bore full responsibility for any economic hardship they may claim. As indicated above, defendants had ample notice of the covenants prior to construction and purchase of the modular home. Testimony at the hearing indicated that defendants had expended $14,000.00 as a deposit on the home in March or April of 2010, but that the home could be cancelled prior to delivery suffering a forfeit of the deposit. Regardless of this option, the defendants chose to pay for the home in full and have it delivered despite having been put on notice by developer that the plans required prior approval. As such, defendants are responsible for any economic hardship which they have imposed upon themselves. Accordingly, we enter the following order.

## ORDER

And now, October 15, 2010, following hearing in this matter, it is hereby ordered that defendants, Jaiks Perso Corp. and David Persaud, are hereby permanently enjoined from construction of a residence located on lot 101, Reish Road, Shelbrooke Estates, Stroud Township, Monroe County, Pennsylvania without obtaining prior written approval from developer of defendants' construction and site development plans as required in the restrictive covenants of record. In addition, defendants are enjoined from constructing a modular home on the premises in question and shall remove the modular home components presently existing on the lot within thirty (30) days of the date of this order.